# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**BRANDON A. MORGAN,**

    **Plaintiff,**

v.    Case No. 23-CV-1105

**MICHAEL SADDY, et al.,**

    **Defendants.**

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Brandon A. Morgan, who is incarcerated and representing himself, sues Michael Saddy and Richard Helm under 42 U.S.C. § 1983 for allegedly using excessive force against him in violation of his Fourth Amendment rights. The defendants move for summary judgment in their favor on Morgan's claims. (Docket # 35.) Morgan opposes the motion. (Docket # 49.) For the reasons stated below, the defendants' motion for summary judgment is granted in part and denied in part.

### PREMLINARY MATTERS

After the defendants' motion for summary judgment was fully briefed, Morgan filed a motion for sanctions wherein he argues that the defendants claimed certain facts were undisputed in bad faith. (Docket # 58.) While Morgan takes issue with how the defendants responded to his proposed findings of facts and presented their arguments, he fails to demonstrate evidence of bad faith. Thus, I will construe Morgan's motion as a motion for leave to file a sur-reply.

Whether to grant a party leave to file a sur-reply brief is a question within the court's discretion. "The decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Merax-Camacho v. U.S.*, 417 F. App'x 558, 559 (7th Cir. 2011) (citing *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 n.2 (7th Cir. 2010)). "In some instances, allowing a filing of a surreply 'vouchsafes the aggrieved party's right to be heard and provides the court with the information necessary to make an informed decision.'" *Univ. Healthsystem Consortium v. United Health Group, Inc.*, 68 F. Supp. 3d 917, 922 (N.D. Ill. 2014) (quoting *In re Sulfuric Acid Antitrust Litg.*, 231 F.R.D. 320, 329 (N.D. Ill. 2005)).

Here, Morgan is clarifying some of the facts he presented and rebuts the characterization of the facts by the defendants. I will accept the sur-reply and consider it where appropriate when deciding the defendants' motion.

## FACTS

It is undisputed that on August 25, 2020, Morgan was part of an attempted robbery of a BP gas station in New Berlin, Wisconsin. (Docket # 48 at ¶¶ 6, 20.) The defendants were police officers with the City of New Berlin and were investigating the repeated burglaries and attempted burglaries of this gas station. (*Id.* ¶ 7.) On the night of August 25, Saddy was parked in an unmarked squad car staking out the gas station. (*Id.* ¶ 11.) At approximately 11:25 p.m., Officer Dreyer reported by radio to all officers, including Saddy, that he observed a white Chrysler 200 matching the suspect vehicle from previous burglaries turn onto South Regency Court near the BP gas station. (*Id.* ¶ 13.) The officers observed the Chrysler drive back and forth in front of the BP station several times, appearing to surveille the station to attempt another robbery. (*Id.*)

At approximately 11:53 p.m., Dreyer reported by radio to all officers that the Chrysler entered the east side of the parking lot of the BP station and that someone had exited the vehicle and was approaching the business on foot. (*Id.* ¶ 14.) The person who exited the vehicle was carrying a pry bar, the weapon that had been used to break the windows in previous burglaries. (*Id.* ¶ 15.) The vehicle then drove around to the back of the gas station, and Saddy, over radio, "instructed all squads to move in to intercept either the vehicle or the suspect on foot in the parking lot." (*Id.* ¶¶ 16–17.) The suspect, who was later identified as Morgan, came to the front of the store on foot, paused, and then ran across the front of the building. (*Id.* ¶ 18.) Morgan ran westbound through the gas station parking lot towards the location of the white Chrysler 200 and sat in the rear passenger area of the vehicle. (*Id.* ¶¶ 18–21.)

The vehicle drove off and headed for the freeway, and a high-speed chase ensued. (*Id.* ¶ 36.) A short while later, the vehicle veered towards an off-ramp, striking the curb, and began spinning in the grassy median area between the on-ramp and off-ramp. (*Id.* ¶ 37.) Saddy approached the vehicle, noting that it was facing in the wrong direction. (*Id.* ¶ 39.) Saddy states that he observed the driver of the vehicle "maneuvering the steering wheel, orientating the wheels to flee back southbound in the wrong direction on the off-ramp, which in turn would have caused the vehicle to enter the freeway in the wrong direction." (*Id.* ¶ 40.) Morgan states that the driver, Robert Bacon, could not have attempted to travel the wrong way on the freeway after spinning out "because Officer Saddy had crashed into the car, disabling it, within seconds of the vehicle hitting the curb and spinning out; there was no time for Bacon to attempt to continue to elude." (*Id.*)

The defendants do not dispute that Saddy "used his unmarked squad to make contact with the suspect's vehicle to end the pursuit, which had lasted more than four minutes" and reached speeds over 100 mph. (*Id.* ¶ 41.) They note that "Saddy used the front driver's side bumper of his squad care to make contact with the rear driver's side quarter panel . . . pushing it against the curb and disabling it." (*Id.* ¶ 42.) Saddy performed this action at a speed of less than 15 miles per hour. (*Id.*)

Saddy exited his squad car, approached the suspect vehicle, and ordered Morgan and Bacon to show their hands and exit the vehicle one at a time. (*Id.* ¶ 44.) Bacon and Morgan moved "hastily towards the passenger side of the vehicle" and the defendants assert that Morgan and Bacon opened the passenger-side door and exited the vehicle. (*Id.* ¶¶ 45–46.) Morgan, however, asserts that while he opened the passenger side rear door, he did not exit the vehicle nor did he attempt to flee. (*Id.* ¶¶ 46, 47.) Rather, he contends that "Saddy grabbed Morgan out of the back-passenger seat and threw him to the ground where he pinned him." (*Id.* ¶ 47.) Saddy commanded Morgan and Bacon to lie down on the ground. (*Id.* ¶ 48.) Defendants assert that while Bacon complied, Morgan did not. (*Id.* ¶¶ 49–50.) Morgan, in contrast, asserts that he was not refusing to comply with Saddy's commands; rather, he was disorientated from hitting his head on the door-frame of the vehicle during the crash and this prevented him from stepping out of the vehicle as ordered by Saddy. (*Id.* ¶ 50.)

The defendants assert that Morgan "continued stepping away from Saddy" and the vehicle and was "looking northward as if planning an escape route." (*Id.* ¶ 51.) Morgan, however, states that he did not stand on his feet or attempt to flee; rather, Saddy immediately grabbed Morgan out of the back passenger seat and threw him to the ground,

pinning him. (*Id.*) The defendants also state that Saddy was alone in handling two suspects, whereas Morgan asserts that both Helm and Officer Hostettler were already present. (*Id.* ¶ 53.) The defendants state that Morgan than shifted his shoulders and body from facing Saddy squarely, to a sideways, "boxer stance" that Saddy recognized as a pre-attack posture indicating an immediate threat of physical assault or an attempt to flee. (*Id.* ¶ 54.) Morgan, in contrast, reiterates that he neither stood on his feet nor in "any type of 'stance'" because he was pinned to the ground by Saddy. (*Id.*)

The defendants state that Saddy then "secured Morgan by the front of his shirt and decentralized him controlling his descent to the grassy median." (*Id.* ¶ 56.) Morgan disputes this fact, asserting that he was already on the ground. (*Id.*) The defendants state that Saddy then "placed his right knee and shin across Morgan's upper shoulder area with his toe on the ground, applying enough pressure (equivalent to less than 50 pounds of body weight) to stabilize him and be able to feel if he tried to move." (*Id.* ¶ 57.) Morgan contends Saddy exerted more than 50 pounds upon him. (*Id.*)

The defendants assert that Morgan did not "appropriately comply" with Saddy's commands to place his hands behind his back. (*Id.* ¶ 58.) While Saddy kept his service pistol on Bacon, who was laying on the ground, "Morgan began to actively resist by twisting his body in a way that physically opposed Saddy's attempts to control him." (*Id.* ¶¶ 59–60.) Morgan disputes that Saddy had both hands on his service pistol because he could feel Saddy punching him. (*Id.* ¶ 59.) He further disputes that he was "actively resisting," stating that he was trying to shield himself from Saddy's attacks. (*Id.* ¶ 60.) Morgan asserts that he was limited in his movements because of Saddy's body weight, was disorientated, and was pinned face-down on the ground with his arms beneath him. (*Id.*) The defendants state that

5

Morgan then "managed to twist his body out from underneath Saddy's knee" and then "rolled towards Saddy and grabbed at his waist area" near his police tools. (*Id.* ¶¶ 61–62.) Morgan disputes this, again stating that Saddy remained on top of him preventing movement. (*Id.* ¶ 62.)

Defendants assert that Saddy then gave Morgan numerous verbal commands to stop moving and resisting while he was on the ground but Morgan did not comply and continued to shift his body position and attempt to get up on his hands and knees. (*Id.* ¶¶ 63–64.) Morgan, in contrast, asserts that any positional movements made were reactionary and caused by disorientation from hitting his head and the pain caused by Saddy's bodyweight and punches. (*Id.* ¶ 64.) Morgan denies attempting to get up on his hands and knees, stating that he could not have done so because Saddy outweighed him by approximately 100 pounds. (*Id.*)

The defendants then assert that Morgan "turned his face towards Saddy's leg, and Saddy feared Morgan intended to bite." (*Id.* ¶ 66.) To prevent this, Saddy struck Morgan's jawline with his hand. (*Id.*) Morgan denies attempting to bite Saddy and notes that any movement was a result of Saddy repeatedly punching Morgan and using his body weight to pin him. (*Id.*)

Defendants state that as Saddy struggled with Morgan on the ground, Helm exited his squad car with a police dog, Askan, on a leash. (*Id.* ¶ 67.) Helm asserts that he feared that Morgan had a weapon because he was involved in an attempted robbery where he was previously holding a pry bar and because his hands were near his waist area, a common location for a weapon. (*Id.* ¶ 68.) Helm further asserts that because Saddy was attempting to control Morgan with one hand and had his service pistol drawn in the other hand, he

6

decided to use Askan to assist in gaining control of Morgan. (*Id.*) Morgan disputes that Saddy had his service pistol drawn at this point and asserts that Saddy, now having two hands free, had Morgan pinned. (*Id.*) He states that his hands were pinned beneath him and thus he was incapable of using them to either attack or wield a weapon; thus, he asserts that there was "no possible way [he] could have fled or posed any danger to any officer or others at that point." (*Id.*) Morgan asserts that to the extent Helm perceived a struggle, Morgan's movements were the result of the pain from Saddy punching him and pinning him with his body weight. (*Id.*)

Defendants state that Helm and Hostettler approached Saddy's location and as Askan and Helm approached Bacon and Morgan, Helm announced at least five times for both men to place their hands behind their backs or they would be bitten by Askan. (*Id.* ¶¶ 70–71.) Defendants assert that Bacon "fully complied" with Helm's commands and was taken into custody by Hostettler, while Saddy continued to struggle with Morgan as he resisted. (*Id.* ¶¶ 74, 76.) Saddy contends that it was only at this point that he holstered his service pistol and had two hands free to struggle with Morgan. (*Id.* ¶¶ 75–76.) Once again, Morgan contends that to the extent the officers perceived a struggle, Morgan's movements were due to his pain and discomfort from Saddy's actions. (*Id.* ¶ 76.)

Defendants assert that Helm again commanded Morgan to place his hands behind his back or he would be bitten by Askan but Morgan continued to "switch his body positions," lifting himself off the ground and twisting towards Saddy with his hands beneath his body. (*Id.* ¶ 79.) Morgan disputes that he was disobeying commands, stating that Helm's commands required him to switch body positions so he could allow himself to be handcuffed. (*Id.*) Morgan further asserts that the defendants were not interested in

7

handcuffing him because he was already incapacitated and was trying to shield himself. (*Id.*) Helm interpreted Morgan's conduct as continued resistance and was concerned Morgan could flee, so Helm directed Askan to bite Morgan's right leg in the calf area to gain control of him and produce his hands from underneath his body by creating a disruption to his forceful resistance. (*Id.* ¶¶ 80–81.) Again, Morgan disputes this, stating that Saddy had him pinned to the ground so he could not have fled or posed any danger to the officers or others; any resistance perceived was movement due to pain. (*Id.* ¶ 80.)

Helm asserts that even with Askan biting Morgan's leg, he still refused to move his arms behind his back, instead pinning them underneath his body. (*Id.* ¶ 83.) As a result, Helm states he delivered "three knee strikes to Morgan's right side in the biceps area." (*Id.* ¶ 84.) Morgan, in contrast, asserts that his arms were already pinned beneath his body and Helm unnecessarily struck him more than three times. (*Id.*) Saddy asserts he finally secured Morgan's left hand behind his back, and Helm secured Morgan's right hand behind his back. (*Id.* ¶ 85.) Helm then commanded Askan to release Morgan's leg. (*Id.* ¶ 86–87.) Saddy then handcuffed Morgan. (*Id.* ¶ 88.)

Helm asserts he asked for ambulances for both Bacon and Morgan, though Morgan states it was actually Officer Ledzian who called an ambulance at Morgan's request. (*Id.* ¶ 90.) The defendants also note that the entire incident lasted approximately 20 seconds. (*Id.* ¶ 91.)

Morgan states that as a result of Saddy's and Helm's actions, he was almost beaten to death, and when he was handcuffed by Saddy, he was "almost dead." (Docket # 58, ¶¶ 4–5.) He also states that "an excerpt from a hospital report indicated Morgan needed to

be resuscitated from his injuries." (Docket # 48, ¶ 107.) Morgan, however, does not provide a copy of the hospital report he refers to.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

ANALYSIS

Morgan claims that the defendants violated his Fourth Amendment rights when they used excessive force to arrest him. The court examines an excessive force claim under the Fourth Amendment's objective reasonableness standard. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). "Whether a police officer used excessive force is analyzed from the perspective of a reasonable officer under the circumstances, rather than examining the officer's actions in hindsight." *Id.* The court considers several relevant factors "including the severity of the crime; whether the suspect posed an immediate threat to the officers or others; whether the suspect was resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties." *Id.* Ultimately, the court should "determine 'whether the force used to seize the suspect was excessive in relation to the danger he posed . . . if left unattended.'" *Id.* (quoting *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011)).

   1.   *Disabling of Vehicle*

Morgan first asserts that Saddy's use of his squad car to disable the vehicle in which he was a passenger was excessive force. When considering the reasonableness of a police officer ramming his car into a suspect's car, courts "must consider the risk of bodily harm that [the officer's] actions posed to [the suspect] in light of the threat to the public that [the officer] was trying to eliminate." *Scott v. Harris*, 550 U.S. 372, 383 (2007). Courts should also consider the suspect's own reckless behavior and whether the suspect "intentionally placed himself and the public in danger by unlawfully engaging in the reckless, highspeed flight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers

are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

In this case, the undisputed evidence supports that Saddy's use of his squad car to disable the Chrysler 200 was not an unreasonable use of force. Morgan does not dispute that the Chrysler 200 was traveling at speeds ranging from about 95 to 110 miles per hour during the police chase. (Docket # 48 at ¶ 35.) He does not dispute that after entering the freeway (northbound on I-894 through the Hale Interchange), the Chrysler 200 veered into the off-ramp, struck the curb, and started to spin in the grassy median area between the on-ramp and off-ramp of West Beloit Road and I-894. (*Id.* ¶¶ 36–38.) Nor does he dispute that as Saddy approached the Chrysler 200, he observed the vehicle facing southbound on the off-ramp, i.e., facing the wrong direction. (*Id.* ¶ 39.) Saddy avers that he sought to end the pursuit because he feared for public safety as the vehicle could reenter the freeway and travel in the wrong direction at high speeds. (*Id.* ¶ 41.) Thus, at a speed of less than 15 miles per hour, Saddy used the front driver's side bumper of his squad car to make contact with the rear driver's side quarter panel of the Chrysler 200, pushing it against the curb and disabling it. (*Id.* ¶ 42.) While Morgan asserts that he hit his head during the crash and felt disorientated as a result (*id.* ¶ 50), there is no evidence in the record that Morgan sought medical care as a result of injuries sustained in the crash.

At bottom, Saddy had a very short time span to decide how to seize Bacon and Morgan, and, given that Bacon and Morgan just fled the scene of a suspected attempted burglary, it was not unreasonable to assume that Bacon would try to flee again the wrong way down the highway. "The calculus of reasonableness must embody allowance for the

11

fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Morgan also argues that Saddy should not have pursued him and Bacon because the police had identified Bacon's car, so pursuit was unnecessary. However, in *Scott*, the Supreme Court noted that the police have an interest in preventing suspects who "drive *so recklessly* that they put other people's lives in danger." 550 U.S. at 385 (emphasis in original). The undisputed evidence shows that Bacon and Morgan engaged in reckless behavior, and given the totality of the circumstances, no reasonable jury could conclude that it was unreasonable for Saddy to use his squad car to disable Bacon's vehicle.

2. *Morgan's Seizure From Vehicle*

Morgan further argues that Defendants used excessive force when seizing him. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). A police officer's use of force is unconstitutional, however, if "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (internal quotations and citations omitted). Further, the use of "significant force" is unreasonable "after a suspect is subdued or has stopped resisting or evading arrest or is, at most, passively resisting arrest." *Gupta v. Melloh*, 19 F.4th 990, 1001 (7th Cir. 2021); *see also Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("[T]he law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest.").

12

In this case, the parties dispute whether Morgan was actively resisting arrest and the amount of force the officers used on Morgan during the seizure. After the vehicle was stationary, Saddy avers that he exited his squad car, approached the Chrysler 200, and ordered Morgan and Bacon to show their hands and exit the vehicle one at a time. (Docket # 48 at ¶ 44.) While both Saddy and Helm aver that Morgan and Bacon opened the passenger-side doors, exited the vehicle, and attempted to flee westbound (*id.* ¶¶ 45–46), Morgan denies this, stating that while he opened the passenger side rear door, he neither exited the vehicle nor attempted to flee (*id.* ¶¶ 46–47). Rather, Morgan contends that Saddy grabbed his shirt collar while he was still in the back passenger seat of the car and threw him to the ground and pinned him with his knee. (*Id.* ¶¶ 47, 56–57.)

Saddy avers that Morgan then turned his face towards Saddy's leg and Saddy feared Morgan would bite him, so he struck Morgan's jawline once as a countermeasure to disrupt his intentions. (*Id.* ¶ 66.) Morgan, in contrast, asserts that it was impossible for him to either flee or pose any danger to the officers because he was disorientated from hitting his head in the crash; Saddy greatly outweighed him and had him pinned to the ground; and he was lying face-down on the ground with his arms beneath him. (*Id.* ¶¶ 60, 64–66.) Morgan further contends that Saddy did not simply strike him once on the jawline, but hit him in the head and face area over 10 times. (*Id.* ¶ 66.)

Helm contends that he feared Morgan was attempting to access a weapon because his hands were near his waist area. (*Id.* ¶ 68.) He asserts that because Saddy was trying to both control Morgan and keep his pistol drawn on Bacon, Helm decided to utilize the police dog to gain control of Morgan before he could access a weapon during Saddy's struggle with Morgan. (*Id.*) Morgan disputes the entirety of Helm's contentions, arguing that Saddy no

13

longer had his service pistol drawn at the time the dog was called, that he was pinned with his hands beneath his body making him incapable of using them for attack or to wield a weapon, and that any "struggle" Helm perceived was as a result of Saddy's repeated punches of Morgan. (*Id.*)

Finally, Helm asserts that Morgan continued to resist even while the police dog was biting him, so Helm struck Morgan's right side in the bicep area three times. (*Id.* ¶¶ 83–84.) Morgan, in contrast, asserts that his arms were already pinned beneath his body and Helm unnecessarily struck him more than three times. (*Id.*)

Once again, the use of "significant force" is unreasonable if a suspect is, at most, passively resisting arrest. *Gupta*, 19 F.4th at 1001. Morgan asserts that he was not actively resisting arrest; rather, he was immobilized face-down on the ground underneath Saddy's body weight and thus unable to either bite the officers or reach for a weapon, as the officers contend. Morgan argues that any movements he made was not active resistance but an attempt to shield himself from Saddy's blows, his disorientation from his head injury, or his discomfort from being pinned under Saddy's knee. I cannot determine, on summary judgment, the credibility of the competing versions of the interactions between Morgan and the officers. On the one hand, a reasonable jury could credit the officers' testimony and find that under the totality of the circumstances the force used was not excessive. On the other hand, a reasonable jury could conclude, based on the totality of the circumstances, that the officers' pinning and striking of Morgan and using the police dog to bite him constitutes excessive force. For these reasons, Defendants' motion for summary judgment as to these alleged uses of excessive force is denied.

14

### 3. Qualified Immunity

Defendants further argue that even if Morgan could establish a constitutional violation arising from an unreasonable use of force by either Saddy or Helm, the defendants are protected by qualified immunity. (Docket # 36 at 25–29.) "Qualified immunity serves to protect those public officials who have violated a constitutional right when the contours of that right were not sufficiently clear at the time to enable a reasonable official to know that his conduct was prohibited." *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 687 (7th Cir. 2007). It is clearly established that a police officer may not use excessive force in arresting an individual, *id.*, especially if the individual is not actively resisting, *see Gupta*, 19 F.4th at 1001; *Miller*, 761 F.3d at 829.

The existence of material factual disputes about the circumstances surrounding Saddy's and Helm's actions precludes a ruling on qualified immunity at this juncture. *See Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018). This does not mean, however, that qualified immunity is no longer available as a defense at trial. *See id.* Rather, at trial, a jury may resolve these disputed facts, and the Court will then determine whether the defendants are entitled to qualified immunity as a matter of law. *See id.* Thus, Defendants' motion for summary judgment as to qualified immunity is denied.

## CONCLUSION

Morgan seeks to hold Officers Saddy and Helm liable for his injuries stemming from his alleged Fourth Amendment violations. While I agree that Saddy's actions in disabling the Chrysler 200 were not unconstitutional, a question of fact remains as to whether Saddy's and Helm's actions in seizing Morgan after the vehicle was stopped were unreasonable. For

these reasons, the defendants' motion for summary judgment is granted in part and denied in part.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Morgan's motion for leave to file a sur-reply (Docket # 58) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket # 35) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the clerk's office will contact the parties regarding further scheduling in this case.

Dated at Milwaukee, Wisconsin this 3rd day of September, 2025.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge